## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KRANTHI GORLAMARI,<br>　　　　　*Plaintiff,* | : | |
| | : | |
| | : | |
| v. | : | **CIVIL NO. 22-2226** |
| | : | |
| VERRICA PHARMACEUTICALS, INC. et al., | : | |
| | : | |
| 　　　　　*Defendants.* | : | |
| | : | |

**Scott, J.**　　　　　　　　　　　　　　　　　　　　　　　　　**March 4, 2026**

### <u>MEMORANDUM</u>

Plaintiff Kranthi Gorlamari, on behalf of himself and all others similarly situated, claims that Defendants Verrica Pharmaceuticals, Inc. ("Verrica") and then-CEO Ted White (collectively, "Defendants") violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder, by misleading investors about the likelihood of FDA approval concerning YCANTH, a drug that treats a contagious viral skin infection known as molluscum contagiosum. Plaintiff seeks to certify a class of investors that were likewise misled by Verrica's alleged misstatements and omissions. Defendants oppose the motion, arguing for similar reasons that Plaintiff is not entitled to the *Basic* presumption of reliance and that the class definition effectively includes class members who could not have been harmed.

Plaintiff submitted the Motion for Class Certification along with the expert report of Dr. Zahn Bozanic on June 13, 2025. ECF Nos. 69, 69-1, and 69-3. Defendants submitted their

1

Response in Opposition on July 31, 2025. ECF No. 71. Plaintiff filed his Reply on September 12, 2025. ECF No. 73. The Court held oral argument on December 2, 2025.[1]

For reasons given below, the Court grants Plaintiff's motion to certify the class after a modification to the proposed Class Definition.

## I.    Background

Verrica Pharmaceuticals, Inc. is a dermatology therapeutics company whose lead product, commercialized as YCANTH and referred to as VP-102 by the Parties, is used to treat a skin infection common in children known as molluscum contagiosum. Second Amended Complaint, ECF No. 40, ¶ 30 (hereinafter "SAC"). Verrica sought and ultimately obtained approval by the U.S. Food and Drug Administration ("FDA") for the marketing of YCANTH. *Id.* ¶ 33.

But the path to FDA approval was fraught with obstacles. Verrica submitted its first New Drug Application ("NDA") to the FDA in September 2019. *Id.* ¶ 61. By July 2020, the FDA issued a Complete Response Letter ("CRL") to Verrica, which indicated that Verrica's NDA will not be approved until certain conditions are met. *Id.* ¶ 62. Verrica resubmitted the NDA for VP-102 in December 2020. *Id.* ¶ 64

As the resubmitted NDA was under review by the FDA, then-CEO of Verrica, Defendant Ted White, told analysts and prospective investors at RBC Capital Markets Global Healthcare Conference on May 19, 2021 that Verrica was confident that the prior hiccups that resulted in a CRL—concerns about the safety of the container through which patients would self-administer VP-102 and about the status of two facilities where Verrica contracted to make VP-102, namely Sterling Pharmaceutical Services, LLC ("Sterling") and PPS—would not impede the progress of

---

[1] It is a lamentable rarity for the Court to decide a motion where the quality of briefing and the quality of oral argument are both top notch. It is, however, to the Court's good fortune to have encountered both excellent briefing and excellent oral argument in this matter. The Court commends Counsel for Plaintiff and Counsel for Defendants for their skillful work on this case.

the resubmitted NDA. *Id.* ¶ 107. Specifically, Defendant White stated that "we fully anticipate that we'll have our inspections take place according to plan, and we have not been notified otherwise." *Id.* Then, on June 2, 2021, during the Jefferies 2021 Virtual Healthcare Conference, Defendant White stated in relevant part that "our new PDUFA [Prescription Drug User Fee Act] goal date is September 23 to give the agency more time to review data and complete one inspection at one of our facilities." *Id.* ¶ 110.

On September 17, 2021, Verrica received a second CRL from the FDA concerning the VP-102 NDA. *Id.* ¶ 70. On September 20, 2021, Verrica informed the market about this CRL, explaining that "the FDA has identified deficiencies at a facility of a contract manufacturing organization [i.e., Sterling], which are not specifically related to the manufacturing of VP-102 but instead raise general quality issues at the facility." *Id.* On September 21, 2021, Verrica's share price fell 8.3%. *Id.* ¶ 72.

On November 29, 2021, Verrica announced that it had resubmitted once again the VP-102 NDA. *Id.* ¶ 77. On March 2, 2022, Verrica indicated on its SEC Form 10-K that this resubmission had "addressed the successful resolution of inspection deficiencies identified at the CMO [i.e. Sterling] in the CRL." *Id.* ¶ 112. Then, on March 9, 2022, Defendant White told attendees at the Cowen 42nd Annual Health Care Conference that he and Verrica will "continue to work with the FDA toward an approval of YCANTH on or before . . . May 24." *Id.* ¶ 114. And on April 14, 2022, at the 21st Annual Needham Virtual Healtchare Conference, White stated that Verrica had hired a former FDA inspector to "go out and do mock inspections at all of our CMO facilities [including Sterling] to ensure that all our CMOs were inspection ready." *Id.* ¶ 115. White also told attendees in response to an analyst's question that he was "very optimistic" regarding the likelihood of FDA approval of the VP-102 NDA. *Id.* ¶ 116. Finally, on May 9, 2022, in its SEC

Form 10-Q, Verrica stated that the FDA inspection of Sterling had met with a "satisfactory resolution." *Id.* ¶ 118.

Yet, on May 24, 2022, Verrica informed the market that it had once again received a CRL for its VP-102 NDA, explaining that there were "deficiencies identified during a general reinspection of Sterling . . ., the contract manufacturing organization that manufactures Verrica's bulk solution drug product." *Id.* ¶ 126. On May 25, 2022, Verrica's share price fell 63.8%. *Id.* ¶ 128.

## II.    Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores v. Dukes*, 564 U.S. 338, 348 (2011) (citation modified). Class certification is "proper only if the trial court is satisfied, after a rigorous analysis, that the perquisites of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). The Court's "rigorous analysis" focuses on "resolv[ing] all factual or legal disputes relevant to class certification, even if they overlap with the merits." *Id.* at 307. Here, it is Plaintiff's burden to "establish[] each element of Rule 23 by a preponderance of the evidence." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012).

Plaintiff must demonstrate, in accordance with Rule 23(a), that (1) the class is so numerous that joinder is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). Because Plaintiff seeks to certify a damages class under Rule 23(b)(3), Plaintiff must also demonstrate (5) that questions of law or fact common to class members predominate

over any questions affecting only individual members and (6) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

Rule 23 also requires a Court that certifies a class to analyze the soundness of the class definition and the class claims, issues, or defenses. Fed. R. Civ. P. 23(c)(1)(B). In particular, "the text of [a class certification] order or an incorporated opinion must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or class to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defense to be treated on a class basis." *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 187 (3d Cir. 2006).

Additionally—and despite not being found anywhere in Rule 23 itself—the Third Circuit obligates district courts to determine whether "the class [is] currently and readily ascertainable based on objective criteria." *Marcus*, 687 F.3d at 592–93; *see also Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir. 2015) ("The source of, or basis for, the ascertainability requirement as to Rule 23(b)(3) class is grounding in the nature of the class-action device itself."); *but see Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015) ("The policy concerns motivating the heightened ascertainability requirement are better addressed by applying carefully the explicit requirements of Rule 23(a) and especially (b)(3).").

### III. Discussion

#### A. Class Definition

Plaintiff moves to certify a Rule 23(b)(3) class under the following definition:

All persons and entities that purchased the publicly-traded common stock of Verrica between May 19, 2021 and May 24, 2022, both dates inclusive ("the Class Period"), and were damaged thereby.

Excluded from the Class are: (a) persons and entities that suffered no compensable losses; and (b)(i) Defendants; (ii) any person who served as an officer and/or director of Verrica during the Class Period, and members of their immediate families; (iii) any entity in which any excluded person or entity has or had a controlling interest; (iv) any trust of which a

defendant is the settlor or which is for the benefit of a defendant and/or member(s) of their immediate families; and (v) the legal representatives, heirs, successors, predecessors, and assigns of any person or entity excluded under provisions (i) through (iv) hereof.

ECF No. 69 ¶ 1.

At oral argument, the Court questioned Plaintiff's counsel about whether the inclusion of "and were damaged thereby" rendered the class definition impermissibly fail-safe. ECF No. 83 at 17:14–19:11. "A class is fail-safe if it is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Pelletier v. Endo Int'l PLC*, 338 F.R.D. 446, 478 (E.D. Pa. 2021) (citation modified). Counsel's response was basically that it is common practice to certify classes with such language, and that response no doubt holds true for some courts within the Third Circuit. *See, e.g.*, *id.* at 478–79 (collecting cases where courts certify classes with phrases equivalent to "and were damaged thereby").

But just because other district courts have certified such classes does not sufficiently allay this Court's concern. Suppose the class is certified with the current definition. If the class prevails on its claims, then all class members reap the benefits of the class action device. If, however, the factfinder ultimately deems that no class members suffered an injury, then the class is zeroed out and all putative members evade the effects of *res judicata* because there exist no persons and no entities that "were damaged thereby." *See, e.g.*, *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) ("[A failsafe] class definition is improper because a class member either wins, or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment."). Fail-safe classes epitomize a heads-I-win, tails-you-lose strategy that this Court will not endorse. Additionally, it remains opaque to this Court about what the phrase, "and were damaged thereby," adds to the class definition.

Therefore, the Court excises "and were damaged thereby" from the proposed Class Definition because it is impermissibly failsafe and because it does not otherwise add to the substance of the proposed Class Definition. The Court also excises subpart (a) of the exclusion in the Class Definition—namely, "persons and entities that suffered no compensable losses"— because excluding such individuals makes the class failsafe for the same reasons that inclusion of "and were damaged thereby" makes the class failsafe.

### B. Ascertainability

To meet the ascertainability requirement, the Plaintiff must "show that '(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 469–70 (3d Cir. 2020) (quoting *Byrd*, 784 F.3d at 163). Here, the ascertainability requirement is easily met. First, the class is defined with reference to objective criteria insofar as class membership hinges on whether a putative class member purchased Verica common stock during the Class Period. Second, determining class membership can be done in a reliable and administratively feasible way through trading records and other sorts of records concerning the acquisition of Verrica common stock.

Accordingly, the proposed Class meets the ascertainability requirement.

### C. Rule 23(a)

#### 1. Numerosity

Federal Rule of Civil Procedure 23(a)(1) requires the Plaintiff to show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). For class actions involving a nationally traded security, it is safe to presume that the numerosity requirement is satisfied. *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018) (collecting cases), *aff'd sub nom. Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 F. App'x 51 (3d Cir. 2019). Plaintiff's

7

expert report strengthens that presumption by establishing that Verrica had more than 27 million shares outstanding during the period and average weekly trading volume on NASDAQ of 1.92% of those outstanding shares. ECF No. 69-3, ¶¶ 17, 75. Defendants do not challenge numerosity.

Accordingly, the proposed Class meets the numerosity requirement.

2. Commonality

Federal Rule of Civil Procedure 23(a)(2) requires that the proposed Class Representative "share[] at least one question of fact or law with the grievances of the prospective class." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). The bar to meet commonality is "not a high one." *Id.* "Moreover, courts in this circuit have recognized that securities fraud cases often present a 'paradigmatic common question of law or fact' of whether a company omitted material information or made misrepresentations that inflated the price of its stock." *Bing Li*, 324 F.R.D. at 339 (citation modified). The proposed Class Representative shares several questions of fact or law with the prospective class, including questions about whether the Defendants made material misstatements or omissions and whether, in making those alleged misstatements or omissions, Defendants violated federal securities laws. Defendants do not challenge commonality.

Accordingly, the proposed Class meets the commonality requirement.

3. Typicality

Typicality requires that the claims or defenses of the representative party are "typical" of those of the class. Fed. R. Civ. P. 23(a)(3). Although "the concepts of typicality and commonality are broadly defined and tend to merge," *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) (citation omitted), "[t]ypicality ensures the interests of the class and the class representatives are aligned so that the latter will work to benefit the entire class through the pursuit of their own goals." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182–83 (3d Cir. 2001) (citation modified). Typicality is met here because Gorlamari's claim rests on the same legal theory as the

that of the rest of the class. Moreover, Defendants have identified no unique defense to which Gorlamari is subject that would render him atypical nor do Defendants otherwise challenge typicality.

Accordingly, the proposed Class meets the typicality requirement.

4. Adequacy

A proposed class representative must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry concerns whether counsel is qualified to represent the interests of the class and whether the class representative has any conflicts of interest with the class that he seeks to represent. *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir. 2009).

The Court finds that counsel is qualified. Glancy Prongay & Murray LLP has ample experience in securities litigation—which has been evident in the firm's performance in this Action—and nothing has convinced the Court that counsel is otherwise unqualified to represent the interests of class. *See* ECF No. 69-5 (GPM Firm Resume). The Court also finds that Kranthi Gorlamari, the proposed class representative, is adequate. Mr. Gorlamari has produced documents in discovery, has remained responsive throughout discovery, and is ready to continue to discharge his fiduciary duty to the class as this Action continues. *See* ECF No. 69-3 (Gorlamari Decl.) ¶¶ 6– 8, 10. Additionally, the Court does not see any conflict between Gorlamari's claims and those of absent class members: Gorlamari's financial interest in this litigation is identical to the that of the class at large, given that all Class Members allege that they were injured by the same conduct of the Defendants. For complex securities cases, not much more can be demanded of a class representative. *Bing*, 324 F.R.D. at 342.

Accordingly, the class counsel and the class representative are adequate.

9

*D. Rule 23(b)(3)*

Plaintiff seeks to certify a damages class action under Rule 23(b)(3), which requires Plaintiff to establish predominance and superiority. The Court takes each element of Rule 23(b)(3) in turn.

    1.  Predominance

To satisfy the first part of Rule 23(b)(3), Plaintiff must show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). Predominance is met when "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, classwide proof." *Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation modified). The predominance analysis "begins, of course, with the elements of the underlying cause of action," which in a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are "(1) material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton, Co.*, 563 U.S. 804, 809–10 (2011) (citation modified). The predominance analysis for a claim under Section 20(a) of the Exchange Act mirrors the predominance analysis for a Section 10(b) and Rule 10b-5 action based on misstatements or omissions. *See, e.g., In re Merck & Co., Inc. Securities, Derivative & ERISA Litig.*, 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013).

Securities class actions under § 10(b) and Rule10b-5 permit plaintiffs to hike a well-trodden path to predominance. To show reliance predominates over any questions affecting individual class members, plaintiffs can ask the Court to presume reliance on the misstatements— what case law calls the "*Basic* presumption." *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–47

(1988) (outlining the presumption of reliance on the market price for misstatements); *see also* *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54 (1972) (outlining a similar presumption for omissions). The presumption applies when plaintiffs can show that the securities market in which they traded was efficient, meaning that the market "incorporate[d] all of the defendant's allegedly false or misleading statements [into the price of the security], so purchasers of that [security] indirectly relied on the challenged statement." *Pelletier*, 338 F.R.D. at 467 (citation modified). In other words, in an efficient market, any actionable misstatement about a security will artificially alter the security's price, and a purchaser of that security can be presumed to rely on those misleading statements by virtue of purchasing the security at the misleadingly attractive price even if the purchaser cannot demonstrate that she was aware of the misstatement at the time she made the purchase. *See, e.g., Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283–84 (2014) (Courts may presume "that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.").

To invoke the presumption, Plaintiff must therefore show that the alleged misrepresentations were public and that the market for Verrica stock—which absorbed those misrepresentations—was efficient during the Class Period. *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 631–32 (3d Cir. 2011). There is no credible dispute that the alleged misrepresentations were public: those statements were made at public conferences and in public securities filings. Thus, the first prong to receive the presumption is met.

To determine whether the market was efficient, courts in the Third Circuit look to the five *Cammer* factors: (i) the average weekly trading volume during the Class Period; (ii) whether a "significant number of securities analysts followed and reported on a company's stock" during the

Class Period; (iii) the quantity of market makers; (iv) whether the company was eligible to file SEC Form S-3; and, most importantly, (v) whether there are empirical facts that show a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer v. Bloom*, 711 F.Supp. 1264, 1285–87 (D.N.J. 1989). Additionally, courts in the Third Circuit may also consider the three *Krogman* factors when assessing market efficiency: (i) the company's market capitalization; (ii) the bid-ask spread, i.e. the difference between the price at which investors are willing to purchase the stock and the price at which stockholders are willing to sell their shares, and (iii) the float, i.e., the percentage of shares held by the public rather than by corporate insiders. *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); *see also DVI*, 639 F.3d at 633 n. 14.

Plaintiffs have submitted the expert report of Zahn Bozanic, Ph.D., which purports to show, alongside Plaintiff's motion papers, that the "market for Verrica's Common Stock was efficient throughout the Class Period." ECF No. 69-3, ¶ 3(a) (hereinafter "Bozanic Report"); *see also* ECF No. 69-1 at 11–18. The Bozanic Report opines that the market for Verrica Common Stock was efficient throughout the class period and further opines that all *Cammer* factors and all *Krogman* factors weigh in favor of concluding that the market was efficient during the Class Period. Bozanic Report, ¶¶ 29–65, 66–75. Review of the Bozanic Report leads the Court to conclude that Plaintiff has satisfied the "rigorous market efficiency analysis" necessary to satisfy the second and final prong to receive the *Basic* presumption of reliance. *DVI*, 639 F.3d at 633.

Typically, defendants aim to rebut the *Basic* presumption by submitting a competing expert report that explains why the affirmative expert report is misguided or incomplete and why the *Cammer* or *Krogman* factors weigh against a plaintiff. *See, e.g., Pelletier*, 338 F.R.D. at 469. Here, however, Defendants make a cleverer but ultimately unsuccessful argument that Plaintiff is

12

not even allowed to ask for *Basic* presumption such that no expert rebuttal—and the burden-shifting labor associated with rebutting that presumption—is warranted here.

Defendants claim that any Class Members that purchased Verrica stock after the September 20, 2021 press release—when Verrica informed the market that it received its second CRL—are not eligible to receive the *Basic* presumption. At oral argument, Defendants relied principally on an unreported case from the Southern District of New York for the proposition that a "[p]laintiff cannot avail itself of the *Basic* presumption of reliance if, by its own admission, the truth was fully revealed prior to the end of the class period." *In re Signet Jewelers Limited Securities Litig.*, 2019 WL 3001084, at *19 (S.D.N.Y. July 10, 2019); *see also* ECF No. 83 at 24:19 - 25:2; 27:8–11; 34:2–7.

Apply *Signet* to the facts at hand, Defendants claim that Plaintiff himself has admitted that the truth was fully revealed prior to the end of the Class Period. More specifically, Defendants point out that, when Plaintiff filed his opposition to Defendants' motion to dismiss, Plaintiff argued that the September 20, 2021 press release—where Verrica announced its receipt of a CRL—"directly contradicted" Defendants' prior misstatements about the positive expectations regarding the Sterling inspections. ECF No. 71 at 15 (citing ECF No. 34 at 23).

The implicit premise in Defendants' argument is that, in an efficient market, directly contradicting a misstatement is equivalent to fully curing the misstatement's effects on the market. The logic of this argument is tempting. Market efficiency suggests that price-distorting misinformation will be cured quickly when the market learns the truth, so when, as Plaintiffs have argued in prior motion practice, Defendants "directly contradicted" their prior misstatement, one might infer that truth in the direct contradiction somehow cured the falsity of the earlier misstatement.

13

But that inference asks for too much too quickly. It asks for too much because the Court harbors doubts about whether the September 20, 2021 press release fully cured or only partially cured the alleged misstatements. Defendants' pointing to Plaintiff's say-so in prior motion practice to assert that the September 20, 2021 press release fully cured the misleading statements to the market is no stronger than Plaintiff's allegations in the Second Amended Complaint that the market did not receive sufficient information to fully correct the misstatements until May 24, 2022, the end of the Class Period. ECF No. 73 at 6–7; ECF No. 34, ¶¶ 13, 80.

Defendants' desired inference asks too quickly because it is scant on the relevant evidence. Unlike Plaintiff—who has provided an expert report and accompanying analysis to establish their entitlement to a presumption of reliance under *Basic*—Defendants have rested on lawyerly argument which, while creative, does not prevail over the Plaintiff's evidence. Additionally, if Defendants' argument about the September 20, 2021 press release holds water, then they should be able to prove that through their own expert analysis of what the market knew and when it knew it. Defendants are, of course, permitted to reraise this issue at summary judgment with the proper evidence.[2]

The proposed Class meets the predominance requirement.

2. Superiority

Plaintiff also must show under Rule 23(b)(3) that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) advises courts, when assessing superiority, to consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent

---

[2] To whatever extent Defendants raise similar arguments in asking the Court to narrow the Class Definition, the Court is willing to revisit those arguments when they are accompanied by expert analysis or other relevant evidence that warrants the inference that the Class Definition is somehow overinclusive.

14

and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re Warfarin Sodium Antitrust Litig.*, 391 F. 3d 516, 533–34 (3d Cir. 2004).

Defendants do not challenge superiority. The Court agrees with Plaintiff that a class action is superior here. ECF No. 69-1 at 27. The Court is not aware of any interest by class members in controlling the prosecution or defense of separate actions. Nor is the Court aware of any ongoing litigation elsewhere involving the same claims. The Court also does not discern any reason why this forum is undesirable nor why this action would be unmanageable as a class action.

Accordingly, the superiority requirement is satisfied.

## IV.    Conclusion

For the reasons stated above, the Court grants Plaintiff's Motion for Class Certification (ECF No. 69) with modification to the proposed Class Definition. An appropriate Order will be entered separately.